FILED

OCT 17 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALITHIA S., | Case No.: 18cv905-AJB(KSC) |
| Plaintiff, | **REPORT AND RECOMMENDA-TION CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | **[Doc. Nos. 18 and 19]** |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her disability benefits. [Doc. No. 1]. Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc. No. 18]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 19]; (3) defendant's Opposition to Plaintiff's Motion [Doc. No. 20]; (4) plaintiff's Reply to defendant's Opposition [Doc. No. 21]; (5) defendant's Sur-Reply to plaintiff's Opposition [Doc. No. 22]; and (6) the Administrative Record [Doc. No. 16].

After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, it is RECOMMENDED the District Court

///

1 DENY plaintiff's Motion for Summary Judgment [Doc. No. 18] and GRANT defendant's

2 Cross-Motion for Summary Judgment [Doc. No. 19.]

3 **I.** ***Procedural History.***

4     Plaintiff filed an application for disability insurance benefits ("SSDI") on April 16,

5 2014 claiming she had been unable to work since January 1, 2012. [Doc. No. 16-5, at p. 2.]

6 Later, on June 20, 2016, while her application for SSDI was still pending, plaintiff also

7 filed an application for supplemental security income benefits ("SSI"). [Doc. No. 16-5, at

8 pp. 12-20.] Plaintiff's claim for disability benefits (SSDI) was denied on August 13, 2014,

9 because it was determined that her condition was not severe enough to prevent her from

10 working. [Doc. No. 16-4, at pp. 5-8.] On September 29, 2014, plaintiff requested

11 reconsideration of her disability claim [Doc. No. 16-4, at p. 10], but her request was denied

12 on January 23, 2015. [Doc. No. 16-5, at pp. 11-15.] The SSA's letter of January 23, 2015

13 explained that plaintiff's request for reconsideration was denied, because it had been

14 determined that she was not disabled as of December 31, 2014, the date she was "last

15 insured for disability benefits."[1] [Doc. No. 16-4, at p. 11.]

16     On March 20, 2015, plaintiff requested a hearing before an Administrative Law

17 Judge (ALJ). [Doc. No. 16-4, at pp. 18-19.] On February 8, 2017, a Notice of Hearing

18 was sent to plaintiff informing her that a hearing would be held before an ALJ on March 16,

19 2017 to consider her claims for SSDI and SSI. [Doc. No. 16-4, at pp. 43-45.] The ALJ

20

21

---

22 [1]   "The onset date of a disability can be critical to an individual's application for

23 disability benefits. A claimant can qualify for SSDI only if her disability begins by her
date last insured, and these benefits can be paid for up to 12 months before her

24 application was filed. *See* 42 U.S.C. § 423(a)(1), (c)(2), (d)(1)(A). In contrast, a claimant

25 is eligible for SSI once she becomes disabled, but she cannot receive benefits for any
period before her application date. *See* 42 U.S.C. §§ 1382(c)(2), (c)(7), 1382c(a)(3)(A).

26 For both programs, the onset date is the date when the claimant is unable to engage in any

27 substantial gainful activity due to physical or mental impairments that can be expected to
last for at least 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)." *Wellington v.*

28 *Berryhill*, 878 F.3d 867, 872 (9th Cir. 2017).

1   held a hearing on March 16, 2017. [Doc. No. 16-2, at pp. 34-77.] On July 6, 2017, the ALJ

2   issued a written opinion concluding plaintiff did not qualify for SSDI or SSI, because she

3   "has not been under a disability within the meaning of the [SSA] from January 1, 2012,

4   through the date of this decision." [Doc. No. 16-2, at p. 19.] Thereafter, plaintiff requested

5   review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the

6   request on March 13, 2018, finding there was no basis for changing the ALJ's decision.

7   [Doc. No. 16-2, at pp. 2-4.] The ALJ's decision became the final decision of the

8   Commissioner as of March 13, 2018, when the Appeals Council issued its letter concluding

9   there was no basis to change the ALJ's determination that plaintiff is not disabled. *See* 20

10   C.F.R. § 404.981. Plaintiff then filed her Complaint in this action on May 10, 2018. [Doc.

11   No. 1.] She also filed an Amended Complaint on June 4, 2018. [Doc. No. 5.]

12   ***II.***   ***Standards of Review – Final Decision of the Commissioner.***

13         The final decision of the Commissioner must be affirmed if it is supported by

14   substantial evidence and if the Commissioner has applied the correct legal standards.

15   *Batson v. Comm'r of the Social Security Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).

16   Under the substantial evidence standard, the Commissioner's findings are upheld if

17   supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the

18   record to support more than one rational interpretation, the District Court must defer to the

19   Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a

20   reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel,*

21   240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings

22   are supported by substantial evidence, we must consider the evidence as a whole, weighing

23   both the evidence that supports and the evidence that detracts from the Commissioner's

24   conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996).

25   ***III.***   ***Discussion.***

26         ***A.***   ***Plaintiff's Claim for Disability Benefits.***

27         A Disability Report completed on or about May 5, 2014 represents that plaintiff has

28   the following physical or mental conditions that support her claim for disability benefits:

(1) osteosarcoma;[2] (2) congestive heart failure; (3) renal failure stage 3B; (4) migraine headaches; (5) deep vein thrombosis; and (6) anxiety. [Doc. No. 16-6, at p. 5.] Her condition allegedly became severe enough to keep her from working on January 1, 2012. [Doc. No. 16-6, at pp. 5-6.] Plaintiff stated she was taking the following medications: Carvedilol (for high blood pressure/heart), Fioricet (for migraines), Warfarin (for blood clots/deep vein thrombosis (DVT)), and Zolpidem (a sedative for insomnia). [Doc. No. 16-6, at p. 8.] The Disability Report also indicates that plaintiff has a high school education, worked in an office job in the field of nutrition from 1999 through 2006, and then owned her own business from 2007 through 2012. [Doc. No. 16-6, at pp. 8-9; Doc. No. 16-6, at p. 34.]

On May 17, 2014, plaintiff completed a Function Report and provided the following information about her medical condition: (1) congestive heart failure causes fatigue and prevents physical activities; (2) renal failure causes fatigue and joint pain; (3) DVT, a blood clotting disorder, affects her physical activity and circulation; (4) headaches limit her daily activities and affect her concentration; (5) insomnia causes exhaustion and concentration problems; and (6) chronic pain interrupts her sleep. [Doc. No. 16-6, at pp. 25-26.]

In the daily activities section of the Function Report, plaintiff indicated that she can take care of personal grooming; feed pets; prepare simple meals for herself and her 15-year old son; do light activities, such as arts and crafts; work on household chores; drive her son to school; and shop for groceries at a store. [Doc. No. 16-6, at pp. 26-28.] Her household chores include dusting, doing the dishes, laundry, watering house and yard plants, sweeping, and sometimes walking the dog. [Doc. No. 16-6, at pp. 26-27.] She does the chores for 10 to 20 minutes at a time or when she is feeling able. There are times when

---

[2]  "Osteosarcoma" is "a sarcoma [malignant tumor] derived from bone or containing bone tissue." Merriam-Webster Medical Dictionary, http://www.merriam-webster. com/dictionary/osteosarcoma.

she is unable to do anything at all. [Doc. No. 16-6, at p. 27.] She is unable to do any lifting or vacuuming, because it is physically too difficult. [Doc. No. 16-6, at p. 28.] Plaintiff is also able to take care of financial matters, such as paying bills and handling a bank account. [Doc. No. 16-6, at p. 28.] The Function Report further states that plaintiff socializes with friends and relatives but is unable to plan for events or gatherings, because she never knows how she will feel. [Doc. No. 16-6, at p. 30.]

With respect to physical activities, plaintiff indicated in the Function Report that her medical condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and concentrate. [Doc. No. 16-6, at p. 30.] In addition, plaintiff represented that she is negatively affected both physically and mentally by stress. [Doc. No. 16-6, at p. 31.] Finally, plaintiff represented that her medications cause drowsiness, dizziness, and fatigue. [Doc. No. 16-6, at p. 32.]

Plaintiff's mother also completed a Function Report on May 21, 2014. The mother's statements about plaintiff's activities and abilities in the Function Report are consistent with the statements made on the Function Report completed by plaintiff. [Doc. No. 16-6, at pp. 14-22.]

On May 17, 2014, plaintiff also completed a Headache Questionnaire. [Doc. No. 16-6, at pp. 23-33.] On this form, plaintiff explained that she began getting severe headaches in 2004 after chemotherapy for cancer, and the headaches have gotten worse since 2011. [Doc. No. 16-6, at p. 23.] She has the headaches on a weekly basis and they can last several hours to two days. The symptoms include severe pounding and throbbing, nausea, light sensitivity, fatigue, blurry vision, and impaired concentration. She believes that stress and physical activity are the causes of her headaches. [Doc. No. 16-6, at p. 23.] Plaintiff reported she had been taking medications for headaches for three years. The medication was Fioricit (a combination of Butalbital, Acetaminophen, and Caffeine). According to plaintiff, this medication worked well for her tension headaches, but she had only had varying results for the migraine headaches. [Doc. No. 16-6, at p. 24.] When she

has headaches, her doctor has advised her to sit or lie down and rest (*i.e.*, no physical or mental activities that involve concentration). [Doc. No. 16-6, at p. 24.]

## B. *The Parties' Cross Motions for Summary Judgment.*

In her Motion for Summary Judgment, plaintiff argues that the District Court should reverse the ALJ's decision and order payment of benefits or remand the case for further administrative proceedings. [Doc. No. 18, at pp. 1-2.] Plaintiff believes that the ALJ's decision is not supported by substantial evidence, because he impermissibly rejected the opinion of her treating physician, Samuel Poniachik, M.D., about her capacity for work without providing specific and legitimate reasons for doing so. In support of this argument, plaintiff cites the Arthritis Medical Source Statement completed by Dr. Poniachik on February 20, 2017, about a month before plaintiff's hearing before the ALJ. Plaintiff argues that the ALJ should have given the opinions on this form greater or controlling weight, which would have resulted in a finding that she does not have the residual functional capacity for "light" work or the capacity to perform the requirements of any job. [Doc. No. 18-1, at pp. 4-8.] Defendant's Opposition and Motion for Summary Judgment argue that the ALJ's residual functional capacity assessment is supported by substantial evidence, and the ALJ gave good reasons for rejecting Dr. Poniachik's opinion. [Doc. No. 19-1, at pp. 4-7.]

## IV. *Sufficiency of the Evidence.*

## A. *Weight Afforded to Contradictory Opinions by Treating, Examining, and Non-Examining Physicians.*

When a treating physician's opinion is contradicted by the opinion or opinions of other doctors, the ALJ must provide "specific and legitimate reasons" for rejecting the treating physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1996).

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. [Citation omitted.] As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician. [Citation

omitted.]  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. [Citation omitted.] [¶]The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d at 831. "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

"[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). "[W]hen an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007). "A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).

**B.**   ***Contradictory Opinions by Treating, Examining, and Non-Examining Physicians.***

As summarized below, the record includes the opinions of two examining physicians and five non-examining physicians who all concluded plaintiff had impairments and limitations but could still work.  In one way or another, the opinions of these physicians all contradict the opinion of plaintiff's treating physician, Dr. Poniachik, that plaintiff has extreme limitations that adversely affect her ability to function in a competitive work situation.

**1.**   ***Treating Physician's Opinion.***

Dr. Poniachik, who was plaintiff's treating physician of about 18 months, made the following representations on a form entitled Arthritis Medical Source Statement:

Plaintiff's symptoms include dizziness; fatigue; pain in her head, neck and body; headaches; swelling; and dyspnea (shortness of breath). [Doc. No. 16-8, at p. 149.] Plaintiff had reduced range of motion in her neck; joint instability; myofascial trigger points; fibromyalgia tender points; impaired sleep; abnormal posture; swelling; and muscle spasms and weakness. [Doc. No. 16-8, at p. 149.] Dr. Poniachik further indicated on the form that plaintiff suffers from medication side effects (dizziness and drowsiness) and has anxiety that affects her physical condition. [Doc. No. 16-8, at p. 150.]

It was also Dr. Poniachik's opinion that plaintiff had physical limitations that would impair her ability to function in a competitive work situation. For example, Dr. Poniachik indicated plaintiff could only walk one block without rest or pain; sit for 30 minutes at a time and stand for only 20 minutes at a time; had to take unscheduled breaks for 5 to 10 minutes every 1 to 2 hours; elevate her legs 90 degrees for 60 to 75 percent of an 8-hour day; be able to shift positions at will; could rarely lift anything 10 pounds or more; and would be absent from work more than four days per month. [Doc. No. 16-8, at pp. 150-152.] Dr. Poniachik also indicated plaintiff was limited in her ability to use her hands, fingers, and arms. [Doc. No. 16-8, at p. 152.] Finally, it was Dr. Poniachik's opinion that plaintiff's symptoms would interfere with her ability to concentrate 25 or more percent of the time even when performing "simple work tasks." [Doc. No. 16-8, at p. 152.]

Based on the record, including testimony by a vocational expert at the hearing before the ALJ [Doc. No. 16-2, at pp. 67-73], plaintiff would be considered disabled under SSA regulations, if the ALJ credited the limitations set forth by Dr. Poniachik on the Arthritis Medical Source Statement.

### 2. *Examining Physician, Kathy A. Vandenburgh, Ph.D.*

On June 13, 2014, about two months after plaintiff applied for disability insurance benefits, a psychological evaluation, including objective testing, was completed by Kathy A. Vandenburgh, Ph.D. The evaluation was requested by The Department of Social Services, Disability Evaluation Department. [Doc. No. 16-7, at pp. 172-178.] Dr. Vandenburgh reported that plaintiff's "posture, gait and mannerisms were within the

normal range. She was alert and appeared to understand simple test questions. Her overall attitude was characterized by what appeared to be sufficient effort." [Doc. No. 16-7, at p. 175.] Her mood was appropriate; she could recall adequate details about her personal history; and she could recall three out of three objects after three minutes. [Doc. No. 16-7, at p. 175.] "During the evaluation, [plaintiff] was able to focus on tasks" and "needed no supervision to persist at tasks." [Doc. No. 16-7, at p. 175.] Objective testing indicated her verbal comprehension was average; her perceptual reasoning and working memory were in the lower average range; and her processing speed was in the borderline range. [Doc. No. 16-7, at p. 176.]

Although Dr. Vandenburgh indicated plaintiff would benefit from treatment to address her claims of anxiety, depression, and chronic pain and fatigue, she concluded plaintiff had no limitations in her ability to socially interact, understand instructions, sustain an ordinary routine without constant supervision, complete simple and detailed or complex tasks but at a slower pace, and concentrate for at least two hours at a time. [Doc. No. 16-7, at pp. 177-178.] She had moderate limitations in her ability to complete complex tasks, and "may have slight impairment concentrating for longer periods of time." [Doc. No. 16-7, at p. 178.]

The ALJ noted that plaintiff reported mental health symptoms related to anxiety, but her medical records and the results of Dr. Vandenburgh's examination indicated as follows: "The claimant has no counseling, therapy, inpatient or outpatient psychiatric treatment from a mental health professional. . . . The claimant has no history of psychiatric hospitalization. A mental status exam showed the claimant had appropriate mood and affect, she had fair attention and concentration, and good insight and judgment. However, the claimant was noted to have low average intellectual functioning upon cognitive testing and some issues with memory. The claimant appeared to be relatively within normal limits, but she did have an exacerbation of mental health symptoms at times, which was also contributed to [by] other psychosocial stressors, such as financial difficulties. Overall, the claimant's medical evidence of record, subjective complaints, and her activities of daily

living suggest that her mental impairment is not as severe as she alleged." [Doc. No. 16-2, at p. 25.] The ALJ afforded Dr. Vandenburgh's opinion "great weight," because "it is consistent with the claimant's cognitive testing and issues with memory despite relatively normal mental status exams and minimal medical management." [Doc. No. 16-2, at p. 26.]

### 3. *Examining Physician Amy L. Kanner, M.D.*

On July 30, 2014, Amy L. Kanner, M.D., a board eligible internist, completed an extensive internal medicine evaluation of plaintiff, including formal testing, at the request of the Department of Social Services, Disability Evaluation Department. [Doc. No. 16-7, at pp. 182-191.] Dr. Kanner tested plaintiff's lungs by having her walk briskly for 20 feet and then measuring her pulse and respiratory rate. [Doc. No. 16-7, at p. 186.] She also tested plaintiff's range of motion in her shoulders, back, and extremities, including her elbows, wrists, hands, hips, knees, and ankles, and they were all "within normal limits" except that she had a "poor range of motion of the left shoulder." [Doc. No. 16-7, at pp. 187-189.] Dr. Kanner found no evidence of joint deformities in plaintiff's shoulders, hips, ankles, or hands. Some tenderness was noted in her lower left extremities "distal to the left calf" (*i.e.*, in the area where plaintiff had surgery for osteosarcoma). [Doc. No. 16-7, at p. 184.] There was no swelling in her knees, and no edema in her ankles. [Doc. No. 16-7, at p. 188.] Plaintiff's strength was "5/5 in all extremities." [Doc. No. 16-7, at p. 188.] Her gait was "within normal limits," and she was able to stand on her heels and toes "and perform tandem gait." She did not need an assistive device to walk. [Doc. No. 16-7, at p. 189.] Dr. Kanner also noted that plaintiff was morbidly obese. [Doc. No. 16-7, at p. 189.]

Based on her comprehensive physical examination and formal testing Dr. Kanner concluded that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours in an 8-hour workday for a maximum of 45 minutes per hour due to her history of deep venous thromboses in the lower left extremity; push and pull; and reach overhead on the right side with no limitations but reach on the left side "less than occasional." [Doc. No. 16-7, at p. 190.] Dr. Kanner also concluded plaintiff

should not do any climbing, work at heights, or around dangerous machinery. [Doc. No. 16-7, at p. 190.]

The ALJ noted that Dr. Kanner "completed a functional assessment" indicating plaintiff "could perform less than light work with a few exertional, postural, manipulative, and environmental limitations." [Doc. No. 16-2, at p. 26.] The ALJ gave Dr. Kanner's opinion "great weight," because "it is somewhat consistent with the overall physical examinations, treatment notes, and medical management." [Doc. No. 16-2, at p. 26.]

### *4.* *Non-Examining Physician, Kim Morris, Psy.D.*

On July 2, 2014, Kim Morris, Psy.D., reviewed plaintiff's medical records to determine whether she had any severe impairments and to assess her residual functional capacity (RFC). Dr. Morris concluded plaintiff had only mild difficulties in her activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, and pace. [Doc. No. 16-3, at p. 8.] Citing her activities of daily living, medical and other treatment, Dr. Morris found that plaintiff's reported symptoms were "partially credible," but Dr. Morris did not believe that plaintiff's statements about the intensity, persistence, and limiting effects of her impairments were substantiated by the objective medical evidence alone. [Doc. No. 16-3, at pp. 8-13.]

In her physical RFC assessment, Dr. Morris indicated plaintiff may have a severe limitation in her left shoulder. [Doc. No. 16-3, at p. 9.] However, Dr. Morris believed plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour day; and had no other exertional limitations except pushing, pulling, or reaching over her head on the left side. [Doc. No. 16-3, at p. 10.] In her mental RFC evaluation, Dr. Morris opined that plaintiff may be moderately limited in her ability to concentrate and understand and remember detailed instructions but had no other significant limitations. [Doc. No. 16-3, at pp. 11-12.]

The ALJ afforded the opinion of Dr. Morris "great weight," because "it is consistent with the minimal treatment notes, consultative report, mental status examinations, cognitive testing, and medical follow up treatment." [Doc. No. 16-2, at p. 26.]

1 ### 5. *Non-Examining Physician Thu N. Do, M.D.*

2 On August 13, 2014, T. Do, M.D., reviewed plaintiff's medical records to assess

3 vocational factors, including plaintiff's ability to perform past relevant work. [Doc. No.

4 16-3, at p. 13.] Dr. Do determined that plaintiff's ability to do her past relevant work was

5 not material, because the guidelines directed a finding that she is not disabled, and she

6 could adjust to other work. [Doc. No. 16-3, at p. 13.] It was his view that plaintiff was

7 capable of "light" work with a few limitations. [Doc. No. 16-3, at pp. 14-15.] The ALJ

8 afforded Dr. Do's opinion "great weight," because it is "consistent with the treatment notes,

9 physical exams, medical management, and [plaintiff's] activities of daily living." [Doc.

10 No. 16-2, at pp. 25-26.] However, the ALJ noted additional environmental limitations were

11 warranted based on further evidence of plaintiff's ongoing body and joint pain. [Doc. No.

12 16-2, at p. 25-26.]

13 ### 6. *Non-Examining Physician Sandra Battis, M.D.*

14 On January 20, 2015, in connection with plaintiff's request for reconsideration,

15 Sandra Battis, M.D., reviewed plaintiff's medical records. [Doc. No. 16-3, at pp. 24-31.]

16 Essentially, Dr. Battis agreed with the prior mental and physical residual functional

17 capacity assessments by Dr. Morris and with the vocational assessment by Dr. Do

18 indicating that plaintiff is not disabled and is capable of "light" work. [Doc. No. 16-3, at

19 p. 30.] Although she acknowledged that plaintiff had "some limitations," it was her view

20 that plaintiff could still do "less demanding" work than that required in her prior jobs.

21 [Doc. No. 16-3, at pp. 30-31.] The ALJ afforded the opinion of Dr. Battis "great weight,"

22 because she reached findings that were similar to Dr. Do's, and because her opinion is

23 "consistent with the treatment notes, physical exams, medical management, and her

24 activities of daily living." [Doc. No. 16-2, at p. 26.] However, the ALJ noted that further

25 evidence indicated that additional environmental limitations were warranted, because of

26 plaintiff's ongoing body and joint pain. [Doc. No. 16-2, at p. 26.]

27 ///

28 ///

## 7. _Non-Examining Physician Tawnya Brode, Psy.D._

On January 20, 2015, also in connection with plaintiff's request for reconsideration, Tawnya Brode, PsyD, reviewed plaintiff's medical records to assess her mental residual functional capacity. [Doc. No. 16-3, at pp. 17-24.] She noted there was no new medical evidence and no new allegations that plaintiff's condition had changed or become worse. It was her view that the record supported the prior denial of benefits because plaintiff's condition was not severe enough to prevent her from working. In reaching her conclusions, Dr. Brode specifically cited the June 13, 2014, psychological evaluation completed by examining physician, Kathy A. Vandenburgh, Ph.D. [Doc. No. 16-3, at pp. 23-24, citing Doc. No. 16-7, at pp. 172-178.] The ALJ afforded Dr. Brode's opinion "great weight," because it is "consistent with the minimal treatment notes, consultative report, mental status examinations, cognitive testing, and medical follow up treatment." [Doc. No. 16-2, at p. 26.]

## 8. _Medical Expert Testimony by Dr. Steven Saul Goldstein._

Dr. Goldstein testified that plaintiff's medically determinable impairments as of June 2016 included congestive heart failure and residual damage to her kidney functions caused by chemotherapy for treatment of osteosarcoma in 2004. Based on the record, he concluded that the osteosarcoma had resolved and had not reoccurred. An ultrasound of her heart in 2009 indicated that "her ejection fraction was 60 to 66 percent," which is in the low normal range, and repeat echocardiograms later showed a higher 69 percent. She also developed a hemorrhage, and, as a result, she is being treated with Coumadin or Warfarin. Dr. Goldstein also testified that plaintiff has a history of obesity and complains of fatigue, but it was his opinion that her fatigue "is psychiatric in nature," because he did not see a cardiac stress test in her records. In addition, Dr. Goldstein testified that the record indicates plaintiff has migraine headaches. [Doc. No. 16-2, at pp. 43-45.]

Dr. Goldstein further testified that plaintiff's impairments did not meet any of the Commissioner's Listings in either 2014 or 2016. It was his opinion that "Warfarin is really the only limiting factor other than her obesity." [Doc. No. 16-2, at pp. 46-47.] Taking

Warfarin, a blood thinner, limits her to "light activities," because medium or heavy work might result in "bruising or injury of some sort." [Doc. No. 16-2, at pp. 46-47.] For the same reason, she should also not be around dangerous moving machinery. [Doc. No. 16-2, at p. 47.] According to Dr. Goldstein, plaintiff presently has no limitations in her lower extremities, but earlier, when she had DVT, plaintiff would have been limited to jobs that did not require pushing and pulling with her legs. [Doc. No. 16-2, at p. 47.] Dr. Goldstein also did not see any evidence that reaching overhead should be limited to occasionally, but if he missed it, he was "happy to stand corrected." [Doc. No. 16-2, at p. 48.]

With respect to migraine headaches, plaintiff's counsel asked Dr. Goldstein whether he was "able to assess what limitations that would impose." [Doc. No. 16-2, at p. 48.] In response, Dr. Goldstein testified that migraine headaches are extremely common in the population and most people who have them can work and function. In his view, it is rare for someone to have migraines so severe that it affects their ability to concentrate. When he evaluates the severity of migraines, Dr. Goldstein looks to see if there are any instances of migraine headaches mentioned where the physician noted the patient had difficulty with concentration. It was Dr. Goldstein's opinion that plaintiff's medical records did not support such a finding. [Doc. No. 16-2, at p. 49.] He also testified that the diagnosis of "cluster headaches is not substantiated. There's not a good description either by history or physical examination that cluster headaches [were diagnosed]. I see the diagnosis mentioned, but nothing objective that would enable me to say that's true." [Doc. No. 16-2, at p. 55.]

In response to further questioning by plaintiff's attorney, Dr. Goldstein testified he did not believe the records support a finding that plaintiff was unable to work back as far as 2014 because of congestive heart failure. He also did not believe plaintiff's alleged fatigue could be caused by chronic heart failure. Rather, based in the record, it was Dr. Goldstein's view that plaintiff's congestive heart failure resolved in 2009. In support of this conclusion, Dr. Goldstein cited cardiac evaluations in 2009 and 2015 indicating that her left ventricular ejection fraction was 60 percent in 2009 and 69 in 2015, both of which

are normal.  [Doc. No. 16-2, at pp. 55-56, citing Doc. No. 16-7, at p. 110; Doc. No. 16-8, at p. 129.]

Plaintiff's counsel referred Dr. Goldstein to treatment notes dated March 19, 2013, which indicate Dr. Pearson prescribed Butalbital-Acetaminophen-Caffeine (Fioricet), and then asked Dr. Pearson whether that indicated plaintiff was "dealing with a severe headache."  [Doc. No. 16-2, at pp. 56-57.]  In response, Dr. Goldstein testified that Butalbital-Acetaminophen-Caffeine is the kind of medicine prescribed to treat pain from "relatively mild migraine headaches," and it is not a medicine that is used to "shut down" or prevent migraines.  [Doc. No. 16-2, at pp. 56-57.]  The ALJ then commented that Dr. Goldstein's testimony was consistent with plaintiff's statement she takes this medication to control headache pain.  [Doc. No. 16-2, at p. 57.]

The ALJ afforded Dr. Goldstein's opinions "great weight," because he is "certified in his specialty" (internal medicine and neurology),[3] and his testimony was "consistent with the objective findings in the record."  [Doc. No. 16-2, at p. 26.]

## C.   *Specific and Legitimate Reasons*.

Based on the foregoing, it is apparent that the opinions of the examining, non-examining, and testifying experts all conflict with the opinion of plaintiff's treating physician, Dr. Poniachik, that plaintiff's physical and other limitations are extreme and severely limit her ability to work.  Therefore, the ALJ's decision must include specific and legitimate reasons for rejecting Dr. Poniachik's opinion.

### 1.   *The ALJ's Residual Functional Capacity Assessment*.

The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a);

---

[3]     Dr. Goldstein's Curriculum Vitae states that he is a member of the American Board of Internal Medicine and the American Board of Psychiatry and Neurology.  He graduated from the University of Chicago in 1969 with a degree in internal medicine and neurology. [Doc. No. 16-7, at p. 194.]

*Batson*, 359 F.3d at 1194. At steps one and two, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since January 1, 2012, but the records submitted in support of her claim indicate she has or has had the severe impairments of osteosarcoma, congestive heart failure, renal failure stage 3B, migraines, headaches, obesity, deep vein thrombosis, and anxiety. [Doc. 16-2, at pp. 21.] At step three, the ALJ concluded that plaintiff's impairments do not meet or equal any of the relevant listings in the SSA's Listing of Impairments. [Doc. No. 16-2, at pp. 22-23.]

Here, plaintiff only challenges the ALJ's step four determination that she retains the residual functional capacity for "light work" with certain limitations. [Doc. No. 16-2, at p. 23.] A step four determination of the claimant's residual functional capacity is based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).

A residual functional capacity assessment considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work. . . ." 20 C.F.R. § 404.1545(a)(4). The physical demands of work activities are "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching). . . ." 20 C.F.R. § 404.1545(b). Mental activities considered in a residual functional capacity assessment include the abilities to understand, remember, carry out instructions, and respond appropriately to supervisors, co-workers, and pressures in a work setting. 20 C.F.R. § 404.1545(c). Other limiting factors, such as epilepsy, vision, hearing, and pain or other symptoms, may also be considered in a residual functional capacity assessment. 20 C.F.R. § 404.1545(d)&(e). After functional limitations or restrictions are assessed on a function-by-function basis, an individual's residual functional capacity is expressed in terms of

exertional levels: "sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

The ALJ's residual functional capacity assessment states as follows: "[T]he claimant has the residual functional capacity to perform light work . . . , such that she can lift and carry 20 pounds occasionally and 10 pounds frequently; and can sit for 6 hours in an 8 hour day, and stand or walk for 6 hours in an 8 hour day. The claimant can frequently push or pull with the lower extremities. The claimant can occasionally reach over head with the left upper extremity and can frequently push or pull with the left upper extremity. The claimant must avoid exposure to workplace hazards, such as dangerous machinery and unprotected heights. In addition, the claimant can understand, remember, and carry out simple instructions for simple tasks." [Doc. No. 16-2, at pp. 28-29.]

### 2. *The ALJ's Reasons for Rejecting the Treating Physician's Opinion.*

With respect to Dr. Poniachik's opinion as expressed on the Arthritis Medical Source Statement, the ALJ's decision states as follows:

> [Dr. Poniachik, a treating physician] opined that the claimant could perform less than sedentary work with a few exertional, postural, manipulative, and environmental limitations. Moreover, the doctor opined that the claimant would require low stress work and would miss more than 4 days of work per month (Ex. 13F). *The opinion of the treating doctor is given little weight, as the extreme limitations appeared to be based on subjective complaints and are not supported by, and are inconsistent with, the objective findings in the overall medical evidence of record (Ex. 5F, 7F, 9F, 10F, & 12F).* [The cited exhibits essentially refer to most of the medical treatment notes in the Administrative Record, as well as the extensive internal medicine evaluation prepared by examining physician, Dr. Kanner.]

[Doc. No. 16-2, at p. 26 (emphasis added).]

### 3. *Inconsistencies Between the Treating Physician's Opinion and the Overall Medical Evidence in the Record.*

Based on a thorough review of the whole record, this Court agrees with the ALJ that the limitations reported by Dr. Poniachik on the Arthritis Medical Source Statement are

"extreme" and are inconsistent with the "overall medical evidence of record" and with Dr. Poniachik's own treatment notes. The main inconsistences are summarized below.

**_Use of Hands and Fingers_.** On the Arthritis Medical Source Statement, Dr. Poniachik stated that plaintiff was limited in her ability to use her hands and fingers. [Doc. No. 16-8, at p. 152.] The Court was unable to locate any evidence in Dr. Ponichik's treatment records or in any other medical evidence in the record to support Dr. Poniachik's opinion that plaintiff was limited in in her ability to use her hands or fingers. To the contrary, Dr. Kanner's extensive physical examination of plaintiff, which included formal testing, specifically states as follows with respect to plaintiff's hands: "There is no evidence of joint deformities. Finger approximation is intact. The claimant is able to make a fist and oppose the thumbs. The hand can be fully extended." [Doc. No. 16-7, at p. 188.] Dr. Kanner also made specific findings that plaintiff has no limitations with "handling" or "fingering." [Doc. No. 16-7, at p. 190.]

**_Use of Arms_.** On February 20, 2017, Dr. Poniachick stated on the Arthritis Medical Source Statement that plaintiff could only use her arms to reach in front of her body 50 percent of an 8-hour working day and could never use her left or right arms to reach over her head. [Doc. No. 16-8, at p. 152.] The Court was unable to locate any evidence in the treatment records to support Dr. Poniachik's opinion that plaintiff was severely limited in her ability to use her arms for reaching. Dr. Poniachik's treatment notes of March 11, 2016 and April 13, 2016 indicate plaintiff had been having "increasing shoulder pain" in her "**_right shoulder_** region" for a few months that was causing discomfort and difficulty with her activities of daily living. A decrease in her range of motion was noted, and she was referred to x-ray "to evaluate degree of arthritis," and to physical therapy for "conservative treatment." [Doc. No. 16-8, at pp. 61, 64-67 (emphasis added).]

Dr. Poniachik's treatment notes and his opinion on the Arthritis Medical Source Statement are at odds with Dr. Kanner's July 30, 2014 physical evaluation which noted plaintiff had "a poor range of motion of the **_left shoulder_**." [Doc. No. 16-7, at pp. 188-189 (emphasis added).] Therefore, Dr. Kanner concluded plaintiff was limited in her ability to

reach over her head with her left arm. [Doc. No. 16-7, at p. 190.] Dr. Kanner's evaluation states that plaintiff had no limitations with using her right arm for reaching, but she could only reach over her head with her left arm on a "less than occasional" basis. As to all other reaching with her left arm, plaintiff was limited to "frequent." [Doc. No. 16-7, at p. 190.] As noted above, the ALJ's residual functional capacity assessment credits Dr. Kanner's evaluation, because it states that plaintiff "can occasionally reach over head with the left upper extremity." [Doc. No. 16-2, at p. 24.]

Since the examination dates by Dr. Poniachik and Dr. Kanner are significantly different (*i.e.*, March/April 2016 versus July 30, 2014), this is one possible explanation for the differences noted in the left and right shoulders. However, given this and other conflicts between the record and Dr. Poniachik's opinion, it was reasonable for the ALJ to resolve the conflict by crediting Dr. Kanner's evaluation. In any event, the medical evidence of record supports the ALJ's conclusion that plaintiff's ability to use her arms for reaching is not as limited as represented by Dr. Poniachik on the Arthritis Medical Source Statement.

***Swelling***. Dr. Poniachik stated on the Arthritis Medical Source Statement that one of plaintiff's symptoms is "swelling" and that plaintiff would have to elevate her legs 90 degrees with prolonged sitting and would need to elevate her legs 60 to 75 degrees for 4 to 6 hours in an 8-hour working day. [Doc. No. 16-8, at p. 151.]

Dr. Poniachik's treatment records indicate plaintiff is at risk for blood clots (deep vein thrombosis or "DVT") and, as a result, she is being treated with a blood thinner (Coumadin). [Doc. No. 16-8, at pp. 2-84.] Medical records from 2012 state that plaintiff went to the doctor, because she had stopped taking the blood thinner and was having pain in her left lower leg. She was concerned about a blood clot. The doctor who was treating her at the time re-started her prescription for the blood thinner and recommended warm compresses. [Doc. No. 16-7, at p. 135.] At the hearing before the ALJ, plaintiff testified she has not had a blood clot since 2012. [Doc. No. 16-2, at p. 73.]

Plaintiff testified at the hearing before the ALJ that in 2012 when she stopped working she was having a lot of swelling and discomfort in her lower left leg, where she

19

had the osteosarcoma removed in 2004. [Doc. 10-2, at p. 61.] Plaintiff also testified she does sit with her legs elevated if her foot or leg feels swollen. She indicated she has "a lot of problems" with swelling at the end of the day. However, she did not testify how often this problem occurs or that she must elevate her legs during the day for extended periods on a regular basis. [Doc. No. 16-2, at pp. 74-75.]

The Court could not locate any evidence in Dr. Poniachik's treatment records to indicate that plaintiff had swelling in her legs on a frequent basis, that Dr. Poniachik recommended that plaintiff elevate her legs, or that Dr. Poniachik believed it was medically necessary for plaintiff to elevate her legs for 4 to 6 hours during an 8-hour working day as he represented in the Arthritis Medical Source Statement. Nor is there anything in Dr. Poniachik's treatment notes indicating plaintiff's prescription for Coumadin, a blood thinner, was not effective in preventing blood clots.

The examining physician, Dr. Kanner, stated in her report that plaintiff reported she "occasionally" had "swelling of her legs, feet, and hands with heat or activity." [Doc. No. 16-7, at p. 183.] At the time she examined plaintiff, Dr. Kanner reported there was no edema or swelling in any of plaintiff's extremities, including her knees or ankles. [Doc. No. 16-7, at pp. 187-188.] Because of her history of DVT, it was Dr. Kanner's view that plaintiff could sit for 6 hours out of an 8-hour workday but could only sit for 45 minutes per hour. In other words, she would need to stand or walk for about 15 minutes per hour. [Doc. No. 16-7, at p. 190.] Dr. Kanner also opined that plaintiff should not work at heights or around dangerous machinery. [Doc. No. 16-7, at p. 190.]

On this topic, Dr. Kanner's opinion is closer to the opinion of the testifying expert, Dr. Goldstein, than to Dr. Poniachik's opinion. It was Dr. Goldstein's view that plaintiff was being adequately treated with a blood thinner (Warfarin/Coumadin), and, unless she had recently had an incident of DVT, she would be limited to "light activities." Because she was taking Warfarin/Coumadin, medium or heavy work might result in "bruising or injury of some sort." [Doc. No. 16-2, at pp. 46-47.] For the same reason, Dr. Goldstein testified plaintiff should not work around dangerous moving machinery. [Doc. No. 16-2,

at p. 47.]  Around the time she had the incident of DVT in 2012, it was Dr. Goldstein's view that plaintiff would have been limited to jobs that did not require pushing and pulling with her legs.  [Doc. No. 16-2, at pp. 46-47.]

In sum, the overall medical evidence of record only supports a conclusion that plaintiff "occasionally" has swelling in her legs.  To address this occasional swelling, plaintiff sits with her legs elevated.  However, the medical evidence of record does not support Dr. Poniachik's opinion that plaintiff is extremely limited in her ability to work, because she must elevate her leg(s) for 4 to 6 hours in an 8-hour working day or elevate her leg(s) at 90 degrees with prolonged sitting.  [Doc. No. 16-8, at p. 151.]

***Attention and Concentration***.  Dr. Poniachik indicated on the Arthritis Medical Source Statement that plaintiff's symptoms would interfere with the attention and concentration needed in a typical work day and that she would be "off task" 25 percent or more of the time even if she was only performing simple work tasks.  [Doc. No. 16-8, at p. 152.]  The Court was unable to locate anything in Dr. Poniachik's treatment notes indicating he determined plaintiff had any deficits in her ability to concentrate.

The opinion expressed by Dr. Poniachik in the Arthritis Medical Source Statement about plaintiff's ability to concentrate and complete simple work tasks conflicts with Dr. Vandenburgh's psychological evaluation of plaintiff, which included objective testing. Based on her evaluation and objective testing, Dr. Vandenburgh determined that plaintiff had no limitations in her ability to socially interact, understand instructions, sustain an ordinary routine without constant supervision, complete simple and detailed or complex tasks but at a slower pace, and concentrate for at least two hours at a time.  [Doc. No. 16-7, at pp. 177-178.]  Dr. Vandenburgh also determined plaintiff had only moderate limitations in her ability to complete complex tasks, and "may have slight impairment concentrating for longer periods of time."  [Doc. No. 16-7, at p. 178.]  Therefore, the overall medical evidence of record contradicts Dr. Poniachik's opinion that plaintiff is severely limited in her ability to concentrate and would be off task 25 percent or more of the time when completing simple work tasks.  [Doc. No. 16-8, at p. 152.]  The record does

support the ALJ's conclusion in the Residual Functional Capacity assessment that plaintiff "can understand, remember, and carry out simple instructions for simple tasks." [Doc. No. 16-2, at p. 23.]

***Medication Side Effects***. Dr. Poniachik stated in the Arthritis Medical Source Statement that the side effects of plaintiff's medications (dizziness and drowsiness) affect her ability to work. [Doc. No. 16-8, at p. 150.] However, Dr. Poniachik's treatment notes do not support a conclusion that plaintiff had any significant side effects from her medications. One treatment note does state plaintiff complained of drowsiness from her medications while they were being adjusted, but this was not repeated in other treatment notes. [Doc. No. 16-8, at pp. 74, 76.] Other treatment notes indicate plaintiff had "[n]o dizziness" and "[n]o side effects" from medications. [Doc. No. 16-8, at p. 58.] Most of Dr. Poniachik's treatment notes simply do not mention plaintiff had any side effects from her medications. [Doc. No. 16-8, at pp. 2-84.] Therefore, the medical evidence of record contradicts and does not support Dr. Poniachik's opinion that side effects from plaintiff's medications adversely affect her ability to work.

***Dyspnea***. Dr. Poniachik indicated in the Arthritis Medical Source Statement that plaintiff's symptoms included dyspnea (labored breathing). [Doc. No. 16-8, at p. 149.] However, Dr. Poniachik's notes do not support a conclusion that dyspnea was a significant symptom that affected plaintiff's ability to work, as there are several treatment notes that say, "[n]o dyspnea." [Doc. No. 16-8, at pp. 9, 24, 39, 58.]

***Anxiety***. Dr. Poniachik indicated in the Arthritis Medical Source Statement that plaintiff's anxiety affects her physical condition and ability to work. However, this statement is not supported by Dr. Poniachik's treatment notes. A treatment note dated September 18, 2015 does state plaintiff had been taking Xanax for anxiety in the past because of stress but she was "doing well at this time." [Doc. No. 16-8, at p. 81.] Later treatment notes state that plaintiff did not have any symptoms of anxiety. [Doc. No. 16-8, at pp. 54, 58, 64, 81, 83.] Accordingly, the medical evidence of record conflicts with and

18cv905-AJB(KSC)

does not support Dr. Poniachik's opinion that plaintiff suffers from anxiety that adversely affects her ability to work.

*__Other Conditions and Symptoms__*. As to other conditions and symptoms listed on Dr. Poniachik's Arthritis Medical Source Statement, such as migraine headaches, chronic pain, fatigue, there is conflicting evidence in the record on the intensity, persistence, and limiting effects of these conditions and symptoms. Based on this Court's review of the overall medical evidence of record, however, it would be reasonable for the ALJ to conclude that these conditions or symptoms were not severe enough to be disabling based on factors, such as the effectiveness of medications, inconsistent symptoms over time, conservative treatment, and expert testimony. The Court notes that it is not necessary for an ALJ to "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). In addition, as noted above, the substantial evidence standard requires the District Court to uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d at 1193. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.*

Based on the foregoing, the ALJ was justified in rejecting the opinion of Dr. Poniachik as expressed on the Arthritis Medical Source Statement, and his reasons for doing so are supported by specific and legitimate reasons. Dr. Poniachik's opinion is not only contradicted by two examining physicians and five non-examining physicians, there are significant inconsistencies between Dr. Ponichik's opinion and the medical evidence of record, including Dr. Ponichik's own treatment records. Under these circumstances, it is this Court's view that substantial evidence supports the ALJ's rejection of Dr. Poniachik's opinion that plaintiff suffers from extreme limitations that significantly and adversely affect her ability to work. In addition, based on a thorough review of the entire administrative record, it is also this Court's view that substantial evidence supports

18cv905-AJB(KSC)

the ALJ's decision that plaintiff is not entitled to disability benefits, because she is not disabled and retains the residual functional capacity to do light work.

## V.   *Conclusion.*

Based on the foregoing, it is RECOMMENDED that the District Court DENY plaintiff's Motion for Summary Judgment [Doc. No. 18]; and GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 19].  Contrary to plaintiff's contention, the ALJ had specific and legitimate reasons to reject the opinion of her treating physician, and substantial evidence supports the ALJ's decision that plaintiff is not disabled because she has the residual functional capacity to do light work that is available in the national economy.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d).  Within fourteen (14) days after being served with a copy of this Report and Recommendation, "any party may serve and file written objections." 28 U.S.C. § 636(b)(1)(B)&(C). The document should be captioned "Objections to Report and Recommendation."   The parties are advised that failure to file objections within this specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: October /7, 2019

Hon. Karen S. Crawford
United States Magistrate Judge

18cv905-AJB(KSC)